**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| LAWRENCE AARON BOWSER, | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | 02: 10-cv-0645 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |


**MEMORANDUM OPINION AND ORDER OF COURT**

November 30, 2010


**I.    INTRODUCTION**

Lawrence Aaron Bowser ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g), for judicial review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") which denied his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act"). This matter comes before the court on cross motions for summary judgment. (Doc. Nos. 12, 15). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be DENIED and Defendant's Motion for Summary Judgment will be GRANTED.

## II.   PROCEDURAL HISTORY

Plaintiff filed for DIB with the Social Security Administration on September 11, 2007, in which he claimed an inability to work due to disability as of February 16, 2007. (R. at 117 – 119)[1].   Plaintiff was initially denied benefits on January 11, 2008. (R. at 68 – 72).  A hearing was conducted on October 24, 2008 at which Plaintiff was represented by counsel and testified. (R. at 22).  A vocational expert, Fred Monaco, also testified. (R. at 22).  The Administrative Law Judge ("ALJ") issued his decision which denied benefits to Plaintiff on December 12, 2008. (R. at 9 – 21).   Plaintiff filed a request for review of the ALJ's decision to the Appeals Council, which request was denied on March 17, 2010, thereby rendering the decision of the ALJ as the final decision of the Commissioner. (R. at 1 – 4).

Plaintiff filed his Complaint in this Court on May 12, 2010.  Defendant filed an Answer on July 30, 2010.   Cross motions for summary judgment followed.


## III.   STATEMENT OF THE CASE

The facts relevant to the present case are limited to the testimony and records that had been presented to the ALJ when rendering his decision.  All other records newly submitted[2] to the Appeals Council or this Court will not be considered. *See* DISCUSSION, *infra* at 14.  Further, the facts relevant to this case will be limited to those regarding Plaintiff's psychological limitations, only.   Plaintiff did not challenge the ALJ's decision on the grounds that his determination with respect to Plaintiff's physical limitations was improper. *See* DISCUSSION, *infra* at 14.

---

[1]        Citations to Doc. Nos. 8 – 8-8, the Record, *hereinafter*, "R. at __."

[2]        R. at 259 - 334.

*A. General Background*

Plaintiff was born July 19, 1963, and was forty five years of age as of the date of the administrative hearing. (R. at 29). Plaintiff graduated from high school and received vocational training and an Associate Degree for electrical maintenance and construction technology. (R. at 31, 171, 220). Plaintiff achieved a 3.62 grade point average. (R. at 220). Prior to his claimed disability, Plaintiff worked both as a service manager and service technician for Reed Holmes, Inc. (R. at 171, 220). Plaintiff was enlisted in the United States Army from 1982 until 1986. (R. at 220). Plaintiff was married and lived at home with his wife and seventeen year old son. (R. at 219). Plaintiff's spouse was employed, and in addition to her income, Plaintiff was receiving worker's compensation payments. (R. at 27, 29 – 30).

Plaintiff's claimed disability began following a work-related electrical shock when he struck an unmarked, buried powerline. (R. at 169, 171). Plaintiff continued to work the day he was shocked. (R. at 171). However, he began to experience psychological impairment following the accident. (R. at 171).

*B. Medical History*

Following his accident, Plaintiff was referred for magnetic resonance imaging ("MRI") of his brain on August 10, 2006. (R. at 184). Plaintiff was complaining of diminished cognitive functioning. (R. at 184). The MRI revealed no abnormality or trauma to the brain; Plaintiff's results were normal. (R. at 184).

Plaintiff was seen and treated for his alleged cognitive dysfunctions by neurologist Benjamin Smolar, M.D., from September 5, 2006, until September 4, 2007. (R. at 156, 176). Dr.

Smolar began his treatment of Plaintiff by performing an electroencephalogram ("EEG") of Plaintiff's brain. (R. at 176). The EEG results showed no abnormalities. (R. at 176).

Plaintiff initially informed Dr. Smolar that he could no longer multi-task at work. (R. at 169). He also complained of feeling overmedicated and dazed after taking drugs prescribed by Dr. Smolar. (R. at 169). Plaintiff further complained that he had difficulty finding his words and frequently became lost while driving. (R. at 169). He reported no difficulties with his sleep. (R. at 161, 169). Plaintiff believed his symptoms were worst approximately three to four weeks after his accident, but that following that period he had been feeling better. (R. at 169). Dr. Smolar noted Plaintiff's earlier normal MRI results, and also found that upon completion of a mini mental status exam, Plaintiff had a normal score of thirty points out of thirty possible points. (R. at 170). Dr. Smolar concluded that Plaintiff presented with only subjective complaints, but that this was suggestive of postconcussive syndrome – without the concussion. (R. at 170).

Throughout the course of his treatment with Dr. Smolar, Plaintiff continued to complain of the same symptoms. Plaintiff had difficulty processing information, had flat affect, felt dazed, had difficulty with words, and had difficulty with his vision. (R. at 156, 161, 163 – 64, 165, 167). However, no physical abnormalities were ever found. (R. at 156, 165). Plaintiff was also still working during part of his treatment period with Dr. Smolar. (R. at 165, 167). He complained of difficulties completing work of which he was formerly capable. (R. at 167). Eventually, Plaintiff went to part-time status, and then quit altogether. (R. at 161, 165, 167). Dr. Smolar often noted that Plaintiff appeared to be cognitively "okay," or even improving. (R. at 156, 161, 163, 165, 167). Yet, Plaintiff did exhibit a short temper and bitterness. (R. at 156, 161). Plaintiff was recommended for cognitive rehabilitation therapy for his subjective complaints of cognitive difficulties. (R. at 168). Dr. Smolar noted on February 13, 2007, that Plaintiff's cognitive

deficits could preclude working for the time being. (R. at 166). Outside of antidepressants and cognitive therapy, Dr. Smolar did not feel that he could provide Plaintiff with relief for his subjective complaints. (R. at 156, 162, 164).

On January 3, 2007, Plaintiff was evaluated by P. Christopher Coburn, Ph.D., for cognitive impairment. (R. at 171 – 73). Dr. Coburn conducted an array of tests including the Test of Memory Malingering, Wechsler Memory Scale-III, and Wechsler Abbreviated Scale of Intelligence, amongst others. (R. at 171 – 72). Plaintiff did not exhibit suboptimal performance, and was of average intelligence. (R. at 172). He was alert and oriented throughout the testing. (R. at 172). No difficulty with concentration was noted. (R. at 172). Some difficulty with immediate and delayed recall was found. (R. at 172). Perceptual spatial ability showed no impairment, and the Hooper Visual Organization Test also reflected no impairment. (R. at 172). There was no evidence of impairment in the Plaintiff's language function. (R. at 172). There was also no evidence of impairment in executive functioning, and no impairment in organization or planning. (R. at 173).

Dr. Coburn indicated that the only significant findings with respect to Plaintiff's cognitive functioning were in the area of verbal learning and memory. (R. at 173). However, this was merely in the low-average range of functioning, and Dr. Coburn believed that Plaintiff could continue to experience improvement. (R. at 173).

Plaintiff received cognitive rehabilitation and adjustment counseling from Catherine Gazzo, M.Ed., from February 7, 2007 until September 4, 2007, after being referred by Dr. Smolar. (R. at 196 – 205). Ms. Gazzo noted that Plaintiff suffered from cognitive deficits seen in those who have sustained mild traumatic brain injury. (R. at 205). Ms. Gazzo determined that the use of compensatory aids and strategies would help Plaintiff cope with his deficits. (R. at

205). She also provided him with education and support. (R. at 205). She suggested more intensive therapy, but Plaintiff declined. (R. at 206).

Over the course of treatment, Ms. Gazzo noted that Plaintiff felt mentally stressed, exhausted, and behind in his work. (R. at 202). Ms. Gazzo indicated that even working part-time was difficult for Plaintiff. When he was not working, no one took his place, and his workload accumulated to unreasonable levels. (R. at 202 – 05). Ms. Gazzo noted complaints by Plaintiff that were similar to those made to Dr. Smolar. (R. at 196 – 205). After quitting his former employment, Ms. Gazzo observed that Plaintiff continued to have the same subjective complaints. (R. at 201). Plaintiff did resume participating in hobbies he enjoyed prior to his accident, but felt no satisfaction when engaging in these activities. (R. at 201).

Ms. Gazzo indicated in her notes on May 21, 2007, that Plaintiff was no longer striving to make improvements in his condition or to return to his "old self." (R. at 199). Plaintiff was presented with a recording device to aid him with remembering and completing tasks. (R. at 203). He returned it after one use, because it allegedly did not help. (R. at 200). Plaintiff complained that his memory seemed to be worsening; however, Ms. Gazzo found that a recent questionnaire completed by Plaintiff indicated that his memory had improved since February of 2007. (R. at 199). Plaintiff was noted as using the strategies learned in therapy to cope with his cognitive deficits, that he had removed himself from over-stimulating environments, and that he was considering taking antidepressants. (R. at 198). However, Plaintiff quit using a prescribed antidepressant after three weeks. (R. at 197). He found the side-effects to be too unpleasant. (R. at 197). Plaintiff was unwilling to try another antidepressant. (R. at 196).

By July of 2007, Plaintiff informed Ms. Gazzo that he had noticed some "good things" that resulted from his accident, including an improved relationship with his two sons. (R. at 197).

However, at his last session with Ms. Gazzo on September 4, 2007, Plaintiff stated that he still suffered from flat affect and felt nothing for activities he once enjoyed, or people with whom he had a relationship. (R. at 196).

On February 20, 2007, Plaintiff was again sent for an MRI of his brain due to his subjective complaints of cognitive impairment. (R. at 175). No abnormality or injury was found. (R. at 175). Plaintiff's MRI results were determined to be normal. (R. at 175).

On September 17, 2007, Plaintiff was examined by ophthalmologist John Charley, M.D., with respect to complaints of vision problems. (R. at 154). Plaintiff reported to Dr. Charley that his right eye felt "dazed," his vision would blur as the day progressed, and judging distance was difficult. (R. at 154). Dr. Charley found that Plaintiff's vision in each eye was 20/20. (R. at 154). In his medical notes, Dr. Charley indicated that he could find no overt, discernible correlate for Plaintiff's purported visual difficulties. (R. at 217). Plaintiff's eyes were – in all respects – normal. (R. at 154 – 55). After an extensive neuro-ophthalmologic examination, Dr. Charley concluded that Plaintiff's vision was "very good." (R. at 155). Dr. Charley had no recommendations for Plaintiff with respect to his eyes. (R. at 155).

On December 6, 2007, Plaintiff was evaluated for psychological limitations by psychologist Julie Uran, Ph.D. (R. at 220). Plaintiff described speech and vision problems to Dr. Uran, as well as poor memory – particularly with respect to task completion. (R. at 220). Plaintiff also described often feeling dazed and confused, and often feeling overwhelmed. (R. at 220 – 21). Plaintiff claimed that he would get lost while hunting in wooded areas he had frequented for twenty years. (R. at 220). Plaintiff also believed that his personality had changed markedly, and revealed that he felt no love for his own family. (R. at 221). Plaintiff denied experiencing mood swings, depression, anxiety, and paranoia. (R. at 221).

Upon examination, Dr. Uran noted that Plaintiff exhibited situationally appropriate mood and affect. (R. at 221). Plaintiff's thought process was normal and relevant with coherent language. (R. at 221). According to Dr. Uran, Plaintiff showed no signs of tangential thinking, flight of ideas, or loosening of associations. (R. at 221). Plaintiff's grammar was poor. (R. at 222). However, Plaintiff was a good narrator of his personal history, and had no difficulty recalling events of the last few months or more recent events, and could recall six digits forward and five digits backward. (R. at 222).

Dr. Uran diagnosed Plaintiff with cognitive disorder, mood disorder, residuals of electrical shock perturbed by significant stressors, and a global assessment of functioning ("GAF") score of 60. (R. at 222). Plaintiff's condition was considered stable. (R. at 222). A Wechsler Memory Scale-III test was performed, and Plaintiff was average to below average. (R. at 222). Immediate and delayed visual recall was average. (R. at 222). Immediate and delayed auditory recall and recognition was one standard deviation below the mean. (R. at 222 – 23). General memory was one standard deviation below the mean, and working memory was average. (R. at 223).

In terms of functional capabilities Dr. Uran concluded that Plaintiff was moderately limited in the following respects: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to interact appropriately with the public; ability to interact appropriately with coworkers; and, ability to respond appropriately to pressures in a usual work setting. (R. at 226 – 27). Plaintiff would require simple instructions, extended time, a slow schedule, and a slow pace, when completing tasks. (R. at 226).

The record indicates that Plaintiff received counseling from licensed psychologist Gary Breisinger, M.A., from August 2, 2008 until October 8, 2008. (R. at 252 – 58). Plaintiff was

referred to Mr. Breisinger for treatment of his psychological issues related to his shock, and to learn coping skills and relaxation techniques. (R. at 252). During his sessions with Mr. Breisinger, Plaintiff complained of confusion, forgetfulness, and changes in his emotional state. (R. at 252). Plaintiff was particularly concerned by his affective problems because of the alleged negative impact it had on his relationship with his wife and children. (R. at 254). While Plaintiff no longer worked, he attempted to remain active around his house, continued to drive, and continued to fish. (R. at 254). Plaintiff had difficulty sustaining this level activity for long periods, however, and he tried to avoid over-stimulation. (R. at 254).

Mr. Breisinger diagnosed Plaintiff as suffering from mood disorder, cognitive disorder, and encephalopathy secondary to traumatic brain injury. (R. at 255). Plaintiff was assessed a GAF score of 50, and his psychosocial stressors were considered to be severe. (R. at 255). Plaintiff was further noted to suffer from moderate depression, marked anxiety, and moderate pain. (R. at 255). During treatment sessions, Mr. Breisinger noted Plaintiff could be tense and irritable, had difficulty with tasks, exhibited anxiety, had no feelings for his wife, and experienced variable problems with vision, concentration, and focus. (R. at 257 – 58).

*C. Functional Capacity*

On December 31, 2007, Kerry Brace, Psy.D., performed a mental residual functional capacity ("RFC") assessment of Plaintiff. (R. at 231). Dr. Brace found no marked limitations. Plaintiff suffered only the following moderate limitations: inability to understand and remember detailed instructions; inability to carry out detailed instructions; inability to maintain attention and concentration for extended periods; inability to work in coordination with or proximity to others without being distracted by them; inability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods; inability to interact appropriately with the general public; inability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; inability to travel in unfamiliar places or use public transportation; and, inability to set realistic goals or make plans independently of others. (R. at 229 – 30).

In justifying the RFC, Dr. Brace adopted the findings of Dr. Uran. (R. at 231). It was concluded that Plaintiff could engage in substantial gainful activity, because he had the capacity to understand and remember simple one and two step instructions, could perform simple, routine, repetitive work, could carry out short and simple instructions, would not require special supervision, could ask questions and accept instruction, could work with others, and could manage jobs not requiring complicated tasks or significant independent decision making. (R. at 231).

### D. Administrative Hearing

Plaintiff testified that he began to have mental and emotional difficulties shortly after his accident. Plaintiff claimed that he suffered from an inability to concentrate, confusion, poor short-term memory, and visual problems. (R. at 34). His symptoms worsened as the day progressed, and his ability to focus could not extend beyond thirty to forty-five minutes. (R. at 42). Plaintiff's ability to read became limited because his vision blurred after approximately thirty to forty-five minutes. (R. at 32). Plaintiff was taking a number of prescribed psychotropic drugs to alleviate his symptoms. (R. at 36). Plaintiff reported mixed results – at times he felt that the medication was slowing him down too much, making him dazed and confused, and worsening his vision. (R. at 36, 44 – 45). Plaintiff also attested to feeling no emotion – no

happiness, sadness, love, or anger. (R. at 56). He felt "flat." (R. at 56). Plaintiff no longer looked forward to anything in his life. (R. at 56).

Plaintiff explained that he normally began his days by waking up around 6:00 or 6:30 in the morning, drinking coffee, using his exercise bike, and lifting weights. (R. at 37). The rest of the day Plaintiff typically spent in a daze, wherein he lost all sense of time. (R. at 38). Plaintiff stated that he would start multiple projects at his home, and then forget to complete the projects. (R. at 38, 41 – 42). He would read and watch some television, but his vision would eventually become blurred. (R. at 39). Further, Plaintiff testified that he had difficulty following what he was watching on television, or reading. (R. at 39, 43). He would typically fix himself only simple meals while at home. (R. at 37). Plaintiff stated that he once enjoyed prior hobbies including hunting and fishing. (R. at 40).

Plaintiff testified that he avoided public places after his accident because the activity overwhelmed him, causing him to become confused and distracted. (R. at 40). He also felt that he had difficulty getting along with people because he would speak too much or say inappropriate things. (R. at 43). Plaintiff believed he could no longer filter his speech. (R. at 43). Plaintiff stated that while he at one time drove every day for work, and continued to maintain his driver's license even after his accident, he now only drove when absolutely necessary. (R. at 30). Plaintiff cited mental overload resulting in blurred vision and the inability to concentrate as his primary reasons for avoiding driving. (R. at 31).

Similarly, Plaintiff left his prior employment because of his mental difficulties – he was having difficulty driving, and he would need to redo his work multiple times. (R. at 33). His prior work entailed installing new wiring in modular homes. (R. at 32). Following his accident, Plaintiff continued to work for approximately five to six months. (R. at 33).

Following Plaintiff's testimony, the ALJ questioned the vocational expert with respect to the availability of jobs in the national economy for a person with Plaintiff's limitations. The ALJ posed the following hypothetical, assuming no exertional limitations: moderate limitation in the ability to understand and remember detailed instructions and to carry out detailed instructions; moderate limitation in interacting appropriately with the public; moderate limitation in interacting appropriately with co-workers; and, moderate limitation in responding appropriately to work pressures in a usual work setting. (R. at 53).

The vocational expert responded that the following jobs would be available to a person with such limitations: sedentary level "surveillance system monitor," with 115,000 positions available in the national economy; light level "bench assembly," with 737,000 positions available; and medium level "cleaner," with 2.2 million positions available. (R. at 54).

Also during the hearing, in response to Plaintiff's stated desire to submit additional evidence for the record, the ALJ asked if thirty extra days following the hearing would be adequate. (R. at 26). Plaintiff replied that thirty additional days would be more than sufficient. (R. at 26). The ALJ accordingly held the record open for an additional thirty days. (R. at 26).

## IV.   STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[3] and 1383(c)(3)[4]. Section 405(g) permits a district court to review

---

[3] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides in pertinent part:

transcripts and records upon which a determination of the Commissioner is based. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).


## V.    DISCUSSION

The ALJ determined that Plaintiff was capable of engaging in substantial gainful activity, with the following limitations: moderate limitation in the ability to understand, remember, and carry out detailed instructions, interact with the public and coworkers, and respond appropriately to work pressures in a usual work setting. (R. at 16).

In response to the ALJ's findings, Plaintiff alleges error in several respects. First, Plaintiff claims that the ALJ should have determined that he was automatically qualified for DIB

at Step 3 of the disability analysis, because under 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, Plaintiff met the requirements of listing 12.02 (Organic Mental Disorders) and 12.04 (Affective Disorder). (Doc. No. 13 at 9 – 10). Specifically, Plaintiff claims to meet the criteria for both because he exhibited marked limitation in maintaining concentration, persistence, and pace, and because he suffered repeated episodes of decompensation of extended duration. (*Id.*). Plaintiff next argues that the ALJ erred in failing to find Plaintiff was disabled from engaging in substantial gainful activity at Step 5, because the ALJ's RFC assessment did not adequately reflect all of Plaintiff's credibly established limitations. (*Id.* at 12).

To support both of these arguments, Plaintiff cites to evidence newly submitted to the Appeals Council following the ALJ's decision. (*Id.* at 6). This evidence includes: (1) a February 13, 2009 narrative report from Thomas A. Franz, M.D.; (2) a January 26, 2009 neuropsychological consultation report by Graham Ratcliff, D.A. and Gary D. Breisinger, M.A.; (3) a January 16, 2009 psychological report by Gary D. Breisinger, M.A.; (4) a January 31, 2009 memorandum by Graham Ratcliff, D.A.; (5) an initial report by Thomas A. Franz, M.D., dated April 10, 2008; and, (6) deposition testimony of Thomas A. Franz, M.D., dated January 1, 2010. (*Id.* at 6, 14). These are the only records submitted after the ALJ's decision was rendered which Plaintiff argues could have had an effect on the ALJ's decision. (*Id.* at 6). All other records newly submitted to the Appeals Council will, therefore, not be discussed. (*See* R. at 282 – 301, 307 - 34).

With respect to new evidence, a claimant may submit said evidence to the Appeals Council for consideration so long as it is material to the period of alleged disability on or before the date of the ALJ's hearing. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001); 20 C.F.R. § 404.970(b). If the new evidence meets the requirements for review, the Appeals Council must

evaluate the new evidence with the prior evidence on record as a whole to determine if the ALJ's decision was supported by substantial evidence. *Id*. However, the Appeals Council may decline review if the ALJ's decision is not at odds with the weight of the evidence on record. *Id*.

When the Appeals Council denies review, the ALJ's determination is conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Matthews*, 239 F.3d at 594-95. As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supports an ALJ's determination. *Id*. A district court is not bound by regulation when reviewing an ALJ's decision, but is instead bound by the Act. 42 U.S.C. § 405(g) states that a "court shall have power to enter, upon *the pleadings and transcript of record*, a judgment affirming, modifying, or reversing a decision of the Commissioner." *Matthews*, 239 F.3d at 594 (citing *Jones v. Sullivan*, 954 F.2d 125, 128 (3d. Cir. 1991) ("Because . . . evidence was not before the ALJ, it cannot be used to argue that the ALJ's decision was not supported by 'substantial evidence.'")). A district court will not, therefore, directly consider new evidence, but instead remand for consideration "by the forum which is entrusted by the statutory scheme for determining disability *vel non*." *Matthews*, 239 F.3d at 594.

In order to remand, however, a claimant must make an appropriate request. *Matthews*, 239 F.3d at 592. The claimant needs to satisfy three requirements. *Id*. at 594. First, new evidence must be "new," in the sense that it is not cumulative of pre-existing evidence on the record. *Szubak v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). Second, new evidence must also be "material," in that it is relevant to the time period and physical impairment(s) under consideration, it is probative, and it is reasonably possible that

such evidence would have changed the ALJ's decision if presented earlier. *Id*. Third, "good cause" must be shown for not submitting the evidence at an earlier time. *Id*. The court demands these three showings be made to avoid inviting claimants to withhold evidence in order to obtain another "bite of the apple" when the Commissioner denies benefits. *Matthews*, 239 F.3d at 595 (citing *Szubak*, 745 F.2d at 834). The court wishes to promote the presentation of all material evidence before the ALJ, as soon as possible. *Id*. at 594-95.

Here, Plaintiff's new evidence was not considered by the Appeals Council because it declined to review the Plaintiff's case. As such, Plaintiff's new evidence cannot be properly considered part of the record before this Court. *Matthews*, 239 F.3d at 594. Therefore, Plaintiff's new evidence will not inform the Ccourt's decision in this case. Further, Plaintiff failed to make a proper showing in accordance with the requirements of *Szubak*, 745 F.2d at 833, and the Court will not remand for consideration of said evidence by the ALJ.

With respect to Dr. Franz's April 10, 2008 evaluation (R. at 302 – 06), Plaintiff neglects to provide any justification for his failure to submit the report before the record was closed thirty days after the administrative hearing on October 24, 2008. The report was clearly in existence at the time of the hearing, and cannot justify a remand according to *Szubak*. Plaintiff also fails to explain why Dr. Franz's deposition testimony from January 28, 2010 meets the requirements for new evidence under *Szubak*. The Plaintiff provides no explanation as to why Dr. Franz – having treated Plaintiff since April 10, 2008 – could not have provided the information included in his deposition testimony prior to or within thirty days of Plaintiff's administrative hearing. Plaintiff merely asserts that the deposition transcript was not available to him until March of 2010. (Doc. No. 13 at 14). Yet, Plaintiff fails to explain why it was necessary to wait until a deposition in another case occurred in January of 2010 to get Dr. Franz to report on Plaintiff's limitations –

which Plaintiff clearly understood to be at issue during the administrative hearing. *See Matthews*, 239 F.3d at 595.

The February 13, 2009 (R. at 260) report of Dr. Franz likewise does not satisfy *Szubak*. The report makes generalized statements regarding Plaintiff's mental condition, without any specific mention of functional limitations, and concludes with a statement that Plaintiff is totally disabled. (R. at 260). In the first place, disability determinations are the sole province of the ALJ. *Zonack v. Commissioner of Social Security*, 290 Fed. Appx. 493, 497 (3d Cir. 2008). *See Adorno v. Shalala*, 40 F.3d 43, 47 − 48 (3d Cir. 1994); 20 C.F.R. § 416.927(e), 404.1527(e). Secondly, Plaintiff failed to show the probative value of the report provided, why it was reasonably possible that the report would have changed the ALJ's decision if presented earlier, and why − in light of Dr. Franz's history of treatment − it took until February of 2009 for the report to be written.

With respect to Mr. Ratcliff's January 31, 2009 memorandum, Plaintiff failed to show how it was either probative or reasonably possible that the memorandum would have changed the ALJ's decision making. Mr. Ratcliff indicated that Plaintiff had slow processing capabilities and poor verbal learning. (R. at 269). Both of these findings were noted by others on the record, as was the finding that Plaintiff tried to avoid overstimulation. (R. at 198, 254, 269). Mr. Ratcliff indicated that he observed testing results which were only, "probably a little worse," than Dr. Coburn's evaluation of Plaintiff. (R. at 269). Plaintiff was noted to tire a little during testing, but "not to an obviously abnormal degree." (R. at 269). Plaintiff did "fairly well" in testing until he was approximately four to five hours into his evaluation − having taken only one twenty-five minute break − and was performing the most difficult portion of the testing. (R. at 269). Mr. Ratcliff made no functional limitations findings, and did not report any observations significantly

different than those offered by other sources in Plaintiff's medical record.  Additionally, Plaintiff failed to explain why Mr. Ratcliff's evaluation was not conducted until after the administrative hearing.  Mr. Ratcliff was an associate of Mr. Breisinger, and Mr. Breisinger had been treating Plaintiff since July of 2008. (R. at 252).  Yet, Plaintiff provided no reason why an assessment was not, or could not have been, conducted earlier.  As such, Mr. Ratcliff's memorandum does not satisfy the requirements of *Szubak*.

Lastly, with respect to Mr. Breisinger's January 16 and 26, 2009 reports, Plaintiff again fails to explain why Mr. Breisinger, who had been treating Plaintiff since July of 2008, had not conducted his evaluations or written these reports until after the administrative hearing. Furthermore, the Plaintiff fails to explain why – when asked by the ALJ if more than thirty days would be necessary to hold the case record open after the hearing – Plaintiff did not mention any of the later scheduled evaluations that were to be conducted.

Plaintiff also did not explain how the presentation of this information to the ALJ would have made it reasonably possible that the ALJ would have come to a different conclusion.  Mr. Breisinger's assertion in his reports that Plaintiff could not function cognitively after three hours is at odds with Mr. Ratcliff's observation that Plaintiff performed relatively well, and tired little, until completing the most difficult portion of testing after the passage of four or five hours. (R. at 267, 269).  In his neuropsychological evaluation of Plaintiff, Mr. Breisinger noted essentially the same subjective complaints as other sources on the record. (R. at 262 – 64).  Plaintiff did fatigue for Mr. Breisinger after approximately three and one half hours, but Mr. Breisinger noted that he was able to continue with the evaluation after a short break. (R. at 262).  Plaintiff put forth good effort, and exhibited adequate vision, hearing, and language comprehension. (R. at 262). Plaintiff's processing speed was well below average, but overall intellectual function was in the

upper half of the average range. (R. at 262 – 63). Plaintiff was able to keep up at slow to moderate rates. (R. at 263). There was evidence that Plaintiff was sacrificing some speed for accuracy, however. (R. at 263). Immediate memory was in the low average range. (R. at 263). There was only a "suggestion" of a minor lapse in attention. (R. at 263). All other cognitive testing was unremarkable. (R. at 263). Mr. Breisinger indicated that his results were fairly similar to those of Dr. Coburn, although he believed his results in the area of processing speed and memory were more severe. (R. at 264).

Taking these findings into account, there is no suggestion by Plaintiff as to why Mr. Breisinger's conclusions are entitled to more weight than those providing less severe evaluations of Plaintiff's condition, or that the ALJ would have favored Mr. Breisinger's conclusions. In reality, there is very little difference between Mr. Breisinger's and Mr. Ratcliff's evaluations of Plaintiff, and the other evaluations on record. In light of the above discussion and Plaintiff's failure to meet the *Szubak* requirements, this Court cannot justify remanding the case to the ALJ for reconsideration within the context of the newly submitted evidence.

Returning to Plaintiff's primary arguments, the Court is first asked to find that Plaintiff is disabled because he meets one of the listings under 20 C.F.R., Pt. 404, Subpt. P, Appx. 1. (Doc. No. 13 at 9 – 10). The Court finds this argument of Plaintiff to be unpersuasive. Unfortunately for Plaintiff, his arguments regarding satisfaction of the requirements under 12.02 and 12.04 were based entirely upon new evidence that the Court will not consider in deciding this case. (*See* Doc. No. 13 at 9 – 10). As a result, these arguments fail.

The Court is next asked to find that the ALJ erred in formulating an RFC assessment that was not reflective of Plaintiff's credibly established medical impairments. (Doc. No. 13 at 12). Plaintiff relies, in part, upon new evidence as support for this contention. (*Id.* at 14). Yet, as

mentioned above, this evidence will not be considered, and inasmuch as Plaintiff's argument relies on such evidence, the argument fails. Plaintiff also argues, however, that the ALJ's RFC assessment was deficient, in part, because he did not properly take Plaintiff's hearing testimony into account. (*Id.* at 11 – 12).

In his motion, Plaintiff reiterates the testimony provided at the administrative hearing: Plaintiff quit his job because he felt he had difficulty driving and could not complete his work effectively; Plaintiff was frequently unable to concentrate, was confused, had poor short-term memory, suffered visual problems, and was easily overstimulated; Plaintiff would lose track of time and become dazed; Plaintiff's medications provided little help and had unpleasant side-effects; Plaintiff had difficulty completing tasks; Plaintiff's emotions were flat; and, all of Plaintiff's psychological problems worsened as the day progressed. (*Id.* at 11).

However, the Court finds that the ALJ adequately addressed Plaintiff's credibly established psychological limitations based upon the objective medical evidence of record. A neuro-ophthalmologic evaluation could not identify any physical problems with Plaintiff's eyesight – in fact, Plaintiff's sight was considered to be "very good." (R. at 17). Plaintiff could care for himself, do housework, and exercise daily. (R. at 17). It had been noted by both Plaintiff and his treating sources that his mental deficits were improving. (R. at 17 – 19). Plaintiff had continued to work for several months following his accident, and only decreased his workload – eventually quitting altogether – of his own accord. (R. at 17). Several doctors on record could find no objective indications of physical injury to Plaintiff's brain, even after MRI's and an EEG. (R. at 18). A series of clinical tests by Dr. Coburn illustrated that even Plaintiff's worst mental deficits were only in the low-average range. (R. at 18). Dr. Uran's assessment of Plaintiff's mental condition largely mirrored the findings of Dr. Coburn. (R. at 18 – 19).

Based upon the findings of Dr. Coburn, Dr. Uran, Dr. Smolar, and Dr. Charley, the ALJ concluded that many of Plaintiff's subjective complaints were not as severe as reported and were inconsistent with objective medical observations. (R. at 17 – 19). The ALJ's RFC assessment therefore adequately reflected Plaintiff's credibly established limitations, and the evidence does not support Plaintiff's contention that his RFC should have included *marked* functional limitations in ability to understand, remember, and carry out detailed instructions, interact with the public and coworkers, and respond appropriately to work pressures in a usual work setting. (Doc. No. 13 at 12). There was also no basis to support Plaintiff's assertion that his functional limitations should have included a three hour work limit due to cognitive deficits – thereby precluding all potential substantial gainful activity. (*Id.*).

## V.    CONCLUSION

Based upon the foregoing, the Court finds that Plaintiff's arguments are unpersuasive, and the ALJ's determination at Steps 3 and 5 of the disability analysis are supported by substantial evidence. To the extent that Plaintiff's arguments were founded upon new evidence that could not be reviewed by the Court, such arguments fail. Further, Plaintiff failed to establish that the evidence newly submitted to the Appeals Council and this Court following the administrative hearing warranted a remand for reconsideration according to *Szubak*. Plaintiff is capable of engaging in substantial gainful activity within the limits set by the ALJ in his RFC assessment.

Accordingly, Plaintiff's Motion for Summary Judgment will be denied, Defendant's Motion for Summary Judgment will be granted, and the decision of the ALJ will be affirmed. An appropriate order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LAWRENCE AARON BOWSER,    )
    )
        Plaintiff    )
    )      02: 10-cv-0645
        v.    )
    )
MICHAEL J. ASTRUE,    )
Commissioner of Social Security,    )
    )
        Defendant    )

**ORDER OF COURT**

**AND NOW**, this 30th day of November, 2010, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

    1.    Plaintiff's Motion for Summary Judgment (Document No. 12) is **DENIED.**

    2.    Defendant's Motion for Summary Judgment (Document No. 15) is **GRANTED.**

    3.    The Clerk will docket this case as closed.

BY THE COURT:

s/Terrence F. McVerry
United States District  Court Judge

cc:    **Eric D. Levin, Esquire**
    Rishor Simone
    Email: rishor.simone1@1stcounsel.com

    **Albert Schollaert,**
    **Assistant U. S. Attorney**
    Email: albert.schollaert@usdoj.gov